Filed 10/14/14  P. v. Yin CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON CHEN YIN,<br><br>    Defendant and Appellant. | B248210<br><br>(Los Angeles County<br>Super. Ct. No. GA082953) |

_____

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael D. Carter, Judge.  Affirmed.

Julie Schumer; Innocence Legal Team Inc. and Patrick Clancy for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Jason Chen Yin was found guilty after a jury trial of arranging a meeting with a minor and going to the arranged meeting place to engage in lewd or lascivious behavior (Pen. Code, § 288.4, subd. (b))[1] and contacting the minor with intent to commit a sexual offense (§ 288.3, subd. (a)). Following the guilty verdicts and represented by new, privately retained counsel, Yin moved for a new trial on the ground his original counsel had provided constitutionally ineffective assistance. The trial court denied the motion after an evidentiary hearing, finding James Blatt, Yin's trial counsel, was credible and Yin was not, and ruling Blatt's pretrial investigation and trial strategy satisfied an objective standard of reasonableness based on what he knew at the time and, in any event, any flaws in Blatt's performance were not prejudicial. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Summary of the Evidence Presented at Trial*

    a. *The People's evidence*

In the fall of 2010 Amanda G., then 13 years old and living in Boise, Idaho, used Facebook and Chatango, two social networking sites, on her computer. Amanda testified Chatango is a website where people, mostly strangers, chat and role play in group conversations or in person-to-person messages visible only to the participants. Amanda described role playing as "kind of like a game but you like type it out, like you can fight and you can, like have a school theme . . . ." Role playing can also include "cybering where you do it [(engage in sexual acts)] over the Internet, . . . type out what you would be doing in real life." According to Amanda, graphic sexual chatting was common among her friends. Amanda's Chatango screen name was Deidarasempaium13, based on one of her favorite Japanese anime characters, and the age displayed on her profile was 13. Amanda never posted her photograph on Chatango.

---

[1]    Statutory references are to the Penal Code.

Amanda and a school friend, McKenna, created a Chatango profile for a fictional 20-year-old-woman named Amaya, who purportedly worked at Disneyland.[2] According to Amanda, people often lied online about their age, appearance and biographical information. McKenna, using the Amaya profile with a screen name of Deidaraoftheheart12, chatted online with Yin, whose profile showed his age as 23. McKenna introduced Amanda and Yin to each other online after Amanda told McKenna she was bored.

Amanda and Yin began chatting on November 8, 2010. Their chats quickly became sexually graphic. Amanda offered to send Yin nude pictures but never did notwithstanding Yin's repeated requests. Their chats often referred to Amanda's age. In a chat dated November 10, 2010 Yin stated, "[T]he likelihood of me actually coming to your house to have sex with you at 13 is basically 0." In another chat in which Yin encouraged Amanda to take nude pictures, he said "well I guess nothing is illegal if no one finds out." In a chat on November 15, 2010 Amanda indicated she was going to create a new profile, and Yin told her to use a legal age like 18.[3] Yin also told Amanda in that chat to make sure she "delete[d] the evidence." In a chat in early December 2010 Yin reluctantly wrote it was "ok" for Amanda to have cybersex with other people as long as "only I get to fuck you in person."

Amanda and Yin also communicated outside of Chatango. They became Facebook friends using their real names, but Amanda's profile picture was usually an anime character. Although Amanda posted real photographs of herself on Facebook, she could not be certain Yin had ever seen one because she deleted them a few days later. Amanda and Yin spoke once on the telephone "for like a minute." They also chatted

---

[2]    Witnesses referred to Amaya as both 19 and 20 years old, a variance that is immaterial to the issues on appeal.

[3]    Amanda used her real age of 13 for the new profile under the screen name Ketsuekideidara and chatted with Yin under that screen name as well.

once on a one-way video call during which Yin masturbated. (Amanda's computer did not have a camera.)

Amanda testified, although she was pretending when she was "cybering" with Yin, she "kind of wanted to do it for real, too," but would be too shy to do anything. She and Yin never arranged to meet except for possibly getting together at an anime convention with McKenna. At some point Amanda told Yin that McKenna had fabricated the Amaya profile. In early December 2010 Amanda's mother called the police after she had discovered the chats between Amanda and Yin. Amanda advised Yin about this on Facebook even though she was told not to contact him again.

Detective Tim Brady of the Boise Police Department testified he took possession of Amanda's computer and obtained her online passwords. On December 8, 2010 Brady began impersonating Amanda online and chatting with Yin, whom he traced to Los Angeles.[4] In their first chat Yin asked whether the police were at Amanda's home or pressing charges against him. After Amanda feigned ignorance, Yin said, "Please tell me this is a joke. You told me that the cops went to your school right?" Amanda responded she did not know what Yin was talking about and suggested somebody must have accessed her Chatango account. Yin wrote, "You have no idea how scared I am right now. I even gave Amaya something to say in case they did. I deactivated Facebook deleted all my programs etc documents . . . everything."[5]

For the next several months Yin and Amanda continued their sexual chat.[6] In early February 2011 Amanda told Yin her mother was taking her to Los Angeles for spring break and she would have time alone at the hotel. (It was at about this time that Detective Brady began working with the Los Angeles Police Department.) Yin asked whether they could "fuck there" and posed logistical questions like whether Amanda

---

[4]     We refer to Brady chatting in Amanda's voice as Amanda for ease of reference.

[5]     Yin wrote the false story he gave Amaya was that "everything we did is role play."

[6]     Brady did not send Yin anything that would indicate Yin was chatting with a minor because he did not believe it was "something a regular 13-year-old would do."

4

could get "the pill" or whether he should bring condoms. Yin wrote, "If something bad between us happen[s] though you won't use this to blackmail me right?" He also wrote, "I[']m scared mostly because of the age. It'd be better if you were legal . . . so nothing bad would happen at all." Through February and March 2011 Amanda and Yin continued to chat about whether Yin would meet Amanda in Los Angeles. Yin expressed reluctance, saying he was busy with school (Yin was working toward a master's degree in biotechnology). Amanda replied it would make her sad if he did not meet her—she thought she meant more to Yin—and kept pressing him for a decision when he said he might not know until the last minute.

On March 18, 2011 Amanda gave Yin the hotel address in Glendale. They chatted until March 22, 2011 about arrangements (for example, birth control, security cameras at the hotel) and having sex although Yin still had not confirmed he would meet her. Amanda said she was concerned intercourse might hurt because it would be her first time and suggested he bring lubrication; Yin replied he would be gentle. On March 23, 2011, the day before they were to meet, Los Angeles Police Detective Charles Schlund took over chatting as Amanda. After Amanda asked whether Yin would be there the following day, Yin wrote, "Not sure yet. Most likely. I want to fuck you so bad right now." They continued chatting with Amanda encouraging Yin to meet her. Amanda asked if Yin would bring her flowers or a teddy bear. At the end of the chat Yin said he would call Amanda after his class ended the following day to let her know if he was going to meet her.

On March 24, 2011 an adult undercover officer pretending to be Amanda called Yin to find out if he was going to show up and told Yin she was in room 309. Yin said he would be there after he picked up some things. Just after 2:00 p.m. Yin arrived and was detained and searched; he had a teddy bear, condoms and lubricant.

    b. *The defense*

      i. *Blatt's opening statement*

In his opening statement, given after the completion of the prosecution's case-in-chief, Blatt told the jury Yin would testify his life had emphasized studying, taking tests

5

and making good grades. The jury would learn that Yin was immature, lacked self-confidence and had no sexual experience whatsoever. What Yin knew about sex he had learned online. Blatt explained in the year before the incident leading to his arrest, Yin discovered cybersex and role playing. Perhaps crossing the line a bit into argument, Blatt told the jury intent would be the critical element in deciding the case. Yin, he said, would testify it is common to lie on the Internet about one's age and Yin thought (or was at least confused about) Amanda was Amaya—part of her role play—and Amaya had led him to believe she was an adult. If she was a minor, he absolutely was not going to have a sexual encounter with her.

ii. *Yin's testimony*

Yin testified consistently with Blatt's opening statement. He was 22 or 23 years old in the fall of 2010, and his life since high school had been devoted to studying "24/7." He had received an academic scholarship from the University of Southern California and had bachelor's degrees in biology and neuroscience. Shy, unable to relate to people and secluded, he had no friends or girlfriends, did not engage in social activities and had never had any sexual experience.

Yin, who was still living with his parents, began chatting online around the fall of 2009 because it was a more comfortable way for him to interact with people. After he saw others engaging in cybersex and role playing in group chats, he began doing it even though he thought it was "kind of inappropriate." He had learned about sex by watching adult pornography.

Yin met Amanda online through McKenna pretending to be Amaya. Amaya's profile indicated she was 20 years old and worked at Disneyland. It described her and her co-workers' jobs and included pictures that made it clear she was an adult. Yin and Amaya chatted about her job and engaged in cybersex. Amanda "randomly showed up one day" in their chats and then contacted Yin online.

At some point Yin saw Amanda's age on her profile. He testified he should have stopped chatting with her as soon as he saw that, but did not because he thought Amaya and Amanda "might be the same person, she might be an adult . . . ." In Yin's experience

6

it was common for people to lie about everything, including their age, on the Internet; Yin portrayed himself as sexually aggressive online because he wanted to feel more confident. Yin further explained he thought Amaya and Amanda might be the same person because Amaya's profile had Amanda's screen name listed as a role play profile,[7] he thought it was unusual that a 13 year old would have a 20-year-old friend and sometimes Amanda indicated during chats she was 19 or 20 years old. When Yin referred to Amanda's age as 13 during various chats, he was simply "follow[ing] along with what her topic was." Yin did not recall Amanda telling him Amaya was really McKenna, but it would not have mattered because "based on everybody lying online, I don't know what's true or false." For that reason, there would be no point asking Amanda her real age.

Yin never suggested he and Amanda should meet and was surprised and scared when she suggested it. He had never met anyone in person whom he had chatted with online and did not want to do so: "It was just to interact with people." And, Yin was not sure of Amanda's age: "If she was a minor, I would look stupid. I don't want to have sex with minors. If she is an adult, I have to follow through and I don't know how to do that either." He had never put on a condom or purchased one. Yin expressed his reluctance by telling Amanda he was busy and did not know if he would be able to meet her. Amanda responded she would be sad if he did not come—she thought it meant he did not like her—and also said she might see a 19 year old she had met online, which made Yin jealous. Yin testified, "And in the end [the detectives] pretty much played with my emotions and I finally decided to go." Yin also thought Amanda's voice on the telephone (which, in reality, was the undercover detective's) was the voice of an adult.

---

[7]     As described in more detail in Yin's declaration in support of his motion for a new trial and as shown on a screen capture of Amaya's Chatango profile introduced into evidence at trial, Amaya's profile identified Ketsuekideidara, the second profile Amanda had set up after the November 15, 2010 chat with Yin, as one of two role play profiles for Amaya.

When he showed up to meet Amanda, he brought his school books so he could study if it did not work out.

### iii. *Impeachment on cross-examination with Yin's psychological evaluation and statement to the police*

During cross-examination the prosecutor informed the court during a sidebar conference she intended to impeach Yin with statements he had made during a voluntary evaluation by Dr. Omar Minwalla, a psychologist with The Institute for Sexual Health, that contradicted his testimony he had never engaged in sex and had not met anyone in person after first meeting online. According to Blatt, the confidential report had been provided to the prosecution when he was trying (successfully, it seems) to negotiate a probationary disposition. The prosecutor acknowledged the report could not be used in her case-in-chief, but argued it could be used for impeachment. The court then asked, "[I]s there any disagreement? I think everybody agrees that it's impeachment and so you can ask about it." Blatt did not object.

The prosecutor asked Yin whether he had told Dr. Minwalla he had met two adult women in person after first meeting them online and had engaged in sexual activity with them. Yin testified, "I was too embarrassed that I had no contact with anybody, so I made those things up." Yin further testified he did not recall telling Dr. Minwalla he had engaged in sexually explicit chatting with 10 girls who said they were 16 or 17 years old and it was not correct in any event. He also did not recall telling Dr. Minwalla that twice girls he believed might be 17 years old had masturbated for him via a live webcam feed. Yin explained, "If that was mentioned, I said they might have indicated some age or something, but that is not the age I believed. They also told me they were adults at the same time." When asked whether he had told Dr. Minwalla he probably would have sex with a 14-year-old girl if she "was a ten," Yin testified he had joked with Dr. Minwalla that he was not interested in a 13- or 14-year-old girl unless "she looks like Jessica Alba or something, maybe. . . . Ten means like Jessica Alba or something, which I don't think a 13- or 14-year old could look like Jessica Alba. That is what I meant by that statement."

8

Yin was also asked about a written statement he had signed after his arrest stating, "I came here to help this 13-year-old girl.  Wasn't certain her age, but that's the age I believe.  Also, the things in the bag were a distraction.  I had no intention of sex and was going to use them as a teaching tool.  I also brought my notes so I could study for a while.  The teddy bear was a gift to her.  The girl was troubled and had a single mom and there was no dad.  I was only intending to counsel her."  Yin explained it made no sense to tell the police he had come to see a 20-year-old girl because he knew she was not 20 when he encountered the police at the hotel.  Additionally, the police "pretty much told me what to write."

2.  *The Trial Court's Denial of Yin's Motion for New Trial*

a.  *The motion and supporting declarations*

After the jury found Yin guilty of contacting a minor with the intent to commit a sexual offense and arranging a meeting with a minor to engage in lewd or lascivious behavior, Yin, represented by new, privately retained counsel, moved for a new trial on the ground he had received ineffective assistance of counsel and Blatt had engaged in unethical conduct and had coerced him to testify untruthfully.  Yin asserted he had explained to Blatt that role players create elaborate stories about their characters and staying in character at all times is essential to keep people interested and engaged.  Yin believed Amanda was a role-play character of 20-year-old Amaya, of whom he had seen several pictures, and never suspected Amanda and McKenna had created Amaya (a role play within a role play).  Yin took covert steps to verify Amaya and Amanda were the same person (for example, asking to see a picture of Amaya and Amanda together) and a number of discrepancies and inaccuracies in Amanda's profile had led him to conclude Amanda was the fictional role-play character (for example, Amanda's profile indicated she was male and living in Japan).  Yin also told Blatt he had gone to great lengths to verify the ages of two other women he had met online, Chezea Edgar and Katrina Gordon, before engaging in sexual activity with them.  Yin gave Blatt contact information for the women, a detailed description of the steps he had purportedly taken to verify their ages and contact information for friends of Yin's who he said could

9

corroborate portions of what Yin had told Blatt, including Bunthoeun Bunmiend. According to Yin and his parents (Rene Yin and Hong Sun),[8] who had retained Blatt and were involved in discussions with him about Yin's defense, Blatt dismissed Yin's explanation as too complicated to present to a jury. The Yins, however, believed Yin's explanation and pattern of age verification were essential to his defense.

Rene and Sun decided to discharge Blatt before the preliminary hearing because he had failed to hire an investigator notwithstanding their repeated requests and they did not believe he was adequately preparing Yin's defense. When Rene and Sun informed Blatt of their decision, he made disparaging comments about the new attorney with whom they had met and claimed he was friends with the judge and the district attorney. Rene declared, "[Blatt] said if [Yin] went with the other attorney [Yin] would lose and [Yin's] life would be ruined, but if [Yin] went with Mr. Blatt will win." Rene and Sun did not discharge Blatt. Blatt finally hired an investigator, David Hance. Hance interviewed Edgar and Gordon by telephone after Rene and Sun paid him $4,000. Because they believed Edgar and Gordon were such important witnesses, Rene and Sun paid Blatt an additional $10,000 for Hance to interview the women in person. Hance never conducted the second interview.

According to the Yins, Blatt told Yin what to say when he testified. In an August 11, 2012 meeting attended by the Yins, Blatt told Yin to appear naive and sexually inexperienced; Blatt said not to mention Yin had met women on the Internet or that he had friends and a social life. On August 18, 2012, two days before trial, Yin met with Blatt alone. In his declaration Yin stated, "[Blatt] told me his theory of the case for the first time. I was to be totally sexual naive (a lie). I was to never have had sex (a lie). I was to act humble in front of the jury. I was to have no[] friends (a lie), buddies (a lie), or social activities (a lie). I was to only study (a lie). I was to have never actually met any person online and then met them in person (a lie). . . . If when I got to the hotel,

---

8      Because Jason Yin and Rene Yin share the same surname, we refer to Rene Yin by his first name for clarity and convenience. (See *Jones v. ConocoPhillips Co.* (2011) 198 Cal.App.4th 1187, 1161, fn. 1.) We refer to his parents as the Yins.

there had been a 13 year old girl there, I would not have done anything (true). If when I got to the hotel, there was an adult female there, I was to say I was too inexperienced to know what to do with her (a lie). . . . Mr. Blatt changed from me **'not mentioning'** these facts to I was suppose to '**deny**' these facts. . . . He said if we followed my theory and my parents theory, I would lose because it was too hard for the jury to understand. If I did his theory, I would win. . . . I knew that I had told Dr. Minwalla about the two women I had met on the Internet and had sex with one of them. Mr. Blatt said I should say that I told this to Dr. Minwalla because I was embarrassed I was a virgin."

Yin told his parents about the meeting. They "talked about Mr. Blatt saying that the DA could not use Dr. Minwalla's report unless Mr. Blatt used it first and to not worry, he could keep it out of evidence." Yin "was afraid what would happen if he did not "do as Mr. Blatt said." After the trial started the Yins went to lunch with Blatt, who repeated the same instructions. Yin did not tell Blatt he would not comply because he was not strong enough to stand up to him. Once Blatt gave his opening statement, Yin "felt that I had [no] choice and had to do what Mr. Blatt instructed me. I was afraid Mr. Blatt would walk out on me, otherwise." Yin did not give Blatt permission to provide Dr. Minwalla's report to the prosecution and did not believe inaccuracies in the report that Yin had identified had been corrected. Yin's declaration, however, did not identify any of the claimed inaccuracies.

In support of his motion for new trial, Yin also submitted reports from interviews with Edgar and Gordon conducted by investigators retained through new defense counsel. Both women described how they had met Yin and said Hance did not ask them whether they had any sexual contact with Yin. Yin also submitted an expert declaration by Dr. James Herriot, a professor of sexology, sexological researcher and computer scientist, describing Internet chat room culture and online role playing. Herriot likened role playing to improvisational theater: "Continuously maintaining in character is important in keeping an improvisational scene going. . . . Similarly, we expect our movie stars to remain fully in character during the entire movie." Herriot also noted, "[a] common genre of Internet chat is called 'Age Play' where the adult improvisers act out fictional

11

scenes 'in which an individual acts and/or treats another as if they were a different age' (Wikipedia).  Often one of the participants plays the role of pretending to be a lot younger than the other.  There can be explicit sexual content in the scene as well."  With respect to age verification, Herriot explained Internet chatters use a "variety of demasking methods to discreetly corroborate the fact that the other participant is role playing," including asking for photographs, attempting to arrange a telephone conversation and asking for information that can be independently verified.

> b. *The hearing*

Rene and Yin testified at the hearing consistent with their declarations.  Blatt testified he did not present the testimony of Edgar and Gordon in Yin's defense because they had failed to corroborate Yin's contention he had verified their ages before engaging in any sexual activity:  "[Yin] indicated to me that he specifically requested their identification, and these witnesses were adamant that there was never an effort made to find out their true age."  Blatt explained, "it was a tactical decision on my part, based upon my experience, that because he did not make . . . any effort to determine their ages, because he had sexual relations with one, because of the information that would now come in front of the jury that he had done this twice before, I felt it would be more harmful.  The witnesses did not want to come and testify.[9]  And the fact of the matter is that his behavior with them was disjointed and somewhat unusual . . . because of his lack of social skills."  Blatt also believed "the whole incident of somehow being with younger women and then finding out their ages, then as a white knight type of an approach coming to their aid appeared to me to be fabricated, and I advised the family of that.  It didn't make sense when you are out there having this sexual language that you are utilizing in reference to your emailing other individuals, so I was suspicious of the story.  We felt it frankly stunk."

---

9    In her interview with the investigator retained by Yin's new counsel, Edgar said Hance did not ask if she would be willing to testify.

Blatt recalled Rene and Sun were dissatisfied with the information Hance had learned in the Edgar and Gordon interviews, "which directly contradicted what Mr. Yin had indicated and they wanted us to go back and, I felt, coerce statements out of these witnesses. We refused to do it." (Blatt was not aware Rene and Sun had directly paid Hance to interview the women again.) Blatt advised the Yins he believed "there was a high likelihood of a conviction and a state prison sentence based upon the last three days of the chats where it became clear that he knew [Amanda's] age and was trying to have a visit without being detected."

Blatt testified he was able to obtain a no-state-prison offer from the People based, in part, on the report he had obtained. Yin, however, refused to consider the offer as long as there was a registration requirement. Blatt was not asked whether he had consulted with Yin about providing the Minwalla report to the prosecutor nor was he questioned about Yin's claims he had complained about inaccuracies in the Minwalla report.

With respect to his opening statement, although Blatt recalled Yin had told him Yin had had sex with Edgar, Blatt "became very suspicious that this man ever had sexual relations with anyone." Blatt also explained his portrayal of Yin as isolated was based on statements Yin had made to Dr. Minwalla and Dr. Minwalla's summary of Yin's social development that "for most of [Yin's] life his parents restricted his social and daily activities, often forced into his room to study, devoid of any other activities except sleeping and bathroom breaks, that Mr. Yin developed a social and developmental suppression and deprivation and physical abuse included forced isolation." Blatt was able to verify Yin's account of his upbringing with Rene.

c. *The court's ruling*

The court denied the motion for new trial. The court found Yin lacked credibility based on his demeanor and trial testimony. In contrast, the court found Blatt "extremely credible. He gave sound reasoning for his decisions, strategic decisions at trial, and he based those sound decisions on the information that he was provided at that time and what he believed to be in the best interest of the case." The court rejected Yin's argument the pretrial investigation of Edgar and Gordon was inadequate in part because

13

they were never asked if they had had sex with Yin: "Even if Mr. Yin had testified that he has had sex in the past and that he has checked the I.D.'s in the past, the jury would still have to deal with the overwhelming evidence that Mr. Yin came to that location with the intent to have sex with a minor. So the fact that the testimony came out that he had never had sex is just a collateral issue and I think that it fails under both prongs as far as a duty to investigate." The court also found Yin was not coerced by Blatt to lie despite his testimony and could have discharged Blatt if he was unhappy with the direction of his defense, as his parents had considered at one point, or chosen not to testify. Finally, the court found Blatt was not ineffective for failing to present an expert witness on Internet role playing: "In fact, there was even a discussion about role playing within role playing. All of that was brought out to the jury."

### 3. *Yin's Sentence*

At the sentencing hearing following denial of the new trial motion, the court rejected Yin's request for probation, finding he was an unsuitable candidate for probation because the unlawful acts were done meaningfully and with purpose. The court further found several factors in aggravation (Yin had acted in a sophisticated manner; the victim was particularly vulnerable; and Yin continued his behavior even after learning the police had become involved) and none in mitigation. Yin was sentenced to an aggregate state prison term of three years four months—the middle term of three years for arranging to meet with and meeting a minor for a lewd purpose, plus one-third the middle term for contacting a minor with the intent to commit a sexual offense to be served consecutively. Yin was awarded 480 days of custody credits, and the court ordered him to pay all applicable fees and penalties.

## DISCUSSION

### 1. *Governing Law and Standard of Review*

"'To establish ineffective assistance of counsel under either the federal or state guarantee, a defendant must show that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and that counsel's deficient performance was prejudicial, i.e., that a reasonable probability exists that, but

14

for counsel's failings, the result would have been more favorable to the defendant.'" (*In re Roberts* (2003) 29 Cal.4th 726, 744-745; see *Strickland v. Washington* (1984) 466 U.S. 668, 694 [104 S.Ct. 2052, 80 L.Ed.2d 674].) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*In re Neely* (1993) 6 Cal.4th 901, 909.) "'The burden of sustaining a charge of inadequate or ineffective representation is upon the defendant. The proof . . . must be a demonstrable reality and not a speculative matter.'" (*People v. Karis* (1988) 46 Cal.3d 612, 656.)

"''"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" [Citations.] "[W]e accord great deference to counsel's tactical decisions" [citation] and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight."'" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.) Nevertheless, although "trial counsel must be accorded wide latitude and discretion regarding trial tactics and strategy, 'the exercise of that discretion must be a reasonable *and informed one* in light of the facts and options reasonably apparent to counsel at the time of trial, *and founded upon reasonable investigation and preparation*." (*In re Jones* (1996) 13 Cal.4th 552, 566; see *In re Cudjo* (1999) 20 Cal.4th 673, 692 ["'[s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation'"]; *People v. Ledesma* (1987) 43 Cal.3d 171, 215 [defendant entitled to "'reasonably competent assistance of an attorney acting as a diligent conscientious advocate'"]; see also *People v. Freeman* (1994) 8 Cal.4th 450, 509 ["Competent counsel is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record. Rather, competent counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances."].) Decisions whether to call particular

15

witnesses are peculiarly matters of trial tactics unless the decision results from the unreasonable failure to investigate. (See *People v. Bolin* (1998) 18 Cal.4th 297, 334.)

Although ineffective assistance of counsel is not a statutory ground for granting a new trial under section 1181, "in appropriate circumstances justice will be expedited by avoiding appellate review, or habeas corpus proceedings, in favor of presenting the issue of counsel's effectiveness to the trial court as the basis of a motion for new trial. If the court is able to determine the effectiveness issue on such motion, it should do so." (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583; see *People v. Callahan* (2004) 124 Cal.App.4th 198, 209.) We review the denial of a motion for a new trial de novo when claimed errors of constitutional magnitude are at stake (*People v. Ault* (2004) 33 Cal.4th 1250, 1260-1262; *People v. Albarran* (2007) 149 Cal.App.4th 214, 224)[10] although we must defer to the trial court's express or implied findings if supported by substantial evidence (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724). Indeed, the trial court's credibility determinations are largely insulated from appellate review: Reviewing courts may not judge "the credibility of witnesses [citation], and the trier of fact is entitled to accept or reject all or any part of the testimony of any witness." (*Kelly-Zurian v. Wohl Shoe Co*. (1994) 22 Cal.App.4th 397, 409; see *People v. Elliott* (2012) 53 Cal.4th 535, 585 ["'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends'"].) "'"Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution . . . ." [Citation.]' [Citation.] 'The standard for rejecting a witness's statements on this ground requires " 'either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions.'"'" (*People v. Brown* (2014) 59 Cal.4th 86, 105.)

---

10　An order granting a motion for new trial on the nonstatutory ground of ineffective assistance of counsel, in contrast, is reviewed for an abuse of discretion. (*People v. Callahan, supra*, 124 Cal.App.4th at p. 209; see *People v. Ault, supra*, 33 Cal.4th at p. 1265.)

## 2. *Yin's Motion for a New Trial Was Properly Denied*

Applying the deferential standard of review to the trial court's express and implied findings and accepting, as we must, its credibility determinations adopting Blatt's version of events (to the extent he was even asked what he did and why he did it) and rejecting Yin's, we agree with the court's conclusion Blatt acted reasonably in defending Yin. Blatt made a strategic decision to present only limited evidence of online role playing and Yin's purported belief that Amanda was a fictional minor created by adult Amaya rather than the other way around. Instead, he emphasized Yin's immaturity and sexual inexperience to argue Yin did not have the intent to commit a sexual act with anyone, let alone a minor. Blatt elected to defend Yin this way because he did not believe, nor did Edgar or Gordon corroborate, Yin's explanation he had intended to verify Amanda's actual age before engaging in any sexual activity or that Yin had previously had sex with individuals he had met online but only after confirming they were adults. Blatt also thought a more detailed age play/role-play-within-a-role-play defense was too complicated for the jury to understand. Blatt's testimony explaining his approach to the case was not physically impossible nor was his testimony clearly false on its face.

Additionally, the trial court's finding Blatt conducted a sufficient, competent investigation is supported by substantial evidence: Blatt hired an investigator who interviewed Edgar, Gordon and one of the additional witnesses Yin had identified to corroborate he had verified Edgar's age before engaging in sexual activity with her. While the investigator's report was cursory, there was nothing on its face to alert Blatt that Hance had failed to ask additional questions that may have corroborated portions of Yin's version of events. According to Blatt's testimony, he concluded the Yins' exhortations to interview the women again were an effort to manufacture witness testimony, which Blatt refused to do. On this record we cannot say Blatt failed to conduct a reasonable inquiry into Yin's defense or conduct a competent investigation. (See *In re Cudjo*, *supra*, 20 Cal.4th at p. 693 ["To say that [defense counsel] *could* have taken other investigative steps is not to say that he *should* have taken them. Rather, to determine whether [defense counsel] performed an adequate investigation of [victim's

17

husband's] potential culpability, we evaluate his decision not to investigate further 'for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'"]; cf. *Howard v. Clark* (9th Cir. 2010) 608 F.3d 563, 570-571 [defense counsel ineffective for failing to interview and present testimony of surviving victim of shooting; "pre-conviction report provided even more reason to try to contact [surviving victim]. The fact that [surviving victim] was reluctant to identify his shooter would have suggested to a reasonable attorney that he might make statements in an interview that would exculpate [defendant] or at least raise doubts as to his guilt"].) Following from Blatt's reluctance to overemphasize the defense Yin had urged, his decision not to call Dr. Herriot to explain role-playing culture on the Internet was also not outside the bounds of reason.

More troublesome than Yin's claims relating to the quality of Blatt's pretrial investigation and his decision not to call an expert witness to augment the testimony that Yin was merely role playing is Blatt's apparent failure to appreciate the potential negative impact of information in Dr. Minwalla's report that could be (and, in fact, was) used to impeach Yin's effort to portray himself as a naive, socially awkward young man without any prior sexual experience whatsoever and, as a result, to undermine his credibility in general.[11] Accepting, as the trial court necessarily did, that Blatt sincerely

_____

[11] As discussed, Blatt provided the Minwalla report to the prosecutor in an attempt to negotiate an acceptable pretrial resolution of the case. Yin's counsel did not ask Blatt about his decision to do so during the evidentiary hearing on the new trial motion, including whether he had notified Yin in advance, or inquire as to any discussions Blatt may have had with Yin or the prosecutor about potential use by the People of the "confidential report" during trial if there was no negotiated plea agreement. In the absence of any testimony on these points from Blatt, Yin's claim Blatt's disclosure of the report constituted ineffective assistance of counsel is not properly resolved on this direct appeal: "It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v.*

18

doubted Yin had ever had sex with anyone, including Edgar and Gordon, and did not knowingly encourage him to lie about his social life or sexual history, Blatt was aware the Minwalla report contained statements from Yin that directly contradicted both Blatt's opening statement and Yin's testimony on these points during his direct examination. To be sure, one of Yin's posttrial declarations states Blatt advised him two days before trial to deflect any questions about these inconsistencies by claiming he was embarrassed by his inexperience and lied to Dr. Minwalla about past sexual episodes. Yin's declaration thus demonstrates that Blatt had anticipated possible cross-examination based on the Minwalla report. Given the inflammatory nature of some of Yin's comments to Dr. Minwalla (for example, that he would have sex with a 13-year-old if she was sufficiently attractive), Blatt could have done more—at least raising the Minwalla report during his direct examination of Yin and presenting the (weak) explanation for the inconsistencies in a more forthright manner.

But even if Blatt's handling of the report fell below an objective standard of reasonableness based on prevailing professional norms, we, like the trial court, do not believe counsel's performance was prejudicial. However presented to the jury, the discrepancies between Yin's trial testimony and his statements to Dr. Minwalla would have permitted the prosecutor to argue to the jury, as she did, "You know, he lies to his doctor but he asks you to believe him in court where he has the most motive to lie. This is what really counts. . . . [H]e has a huge motive to lie and say that he never intended to have any interaction with a 13, 14-year-old girl, and that he didn't believe that that was her true age." Given the strength of the evidence against Yin—his admission to the police following his arrest that he came to the hotel to "help this 13-year-old girl"; the repeated references to Amanda's age during their Internet chats; and the elaborate preparations for what was intended to be a real-life meeting, not continued role play, that included extensive planning to avoid detection by Amanda's mother or security cameras

_Mai_ (2013) 57 Cal.4th 986, 1009; accord, _People v. Carter_ (2003) 30 Cal.4th 1166, 1211.)

19

and concluded with Yin's arrival at the arranged meeting place with a teddy bear and lubricants—it is not reasonably probable that a different approach to the Minwalla report would have led to a result more favorable to Yin.

## DISPOSITION

The judgment is affirmed.


PERLUSS, P. J.

We concur:


ZELON, J.


SEGAL, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.